**GRANVILLE HOUSE, INC., Plaintiff,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants.**

**No. Civ. 4–80–279.**

United States District Court,
D. Minnesota, Fourth Division.

Nov. 10, 1982.

Warren P. Eustis, Minneapolis, Minn., for plaintiff.

Alan Held, St. Paul, Minn., for Com'r of Public Welfare for State of Minn.

James M. Rosenbaum, U.S. Atty. by Mary L. Egan, Asst. U.S. Atty., Minneapolis, Minn., J. Paul McGrath, Asst. Atty. Gen. by Linda Cromwell, Susanne M. Lee, Dept. of Health and Human Services, Washington, D.C., for U.S.

## MEMORANDUM OPINION

MILES W. LORD, Chief Judge.

### I. PROCEDURAL HISTORY

Granville House, Inc., is a nonprofit Minnesota corporation operating three separate residential chemical dependency treatment centers. The three centers are: (1) Team House, with a population of approximately 36, which serves men 17 and older; (2) Jane Dickman House, with a population of approximately 36, which serves women aged 16 years and older; and (3) Warren Eustis House, with a population of approximately 34, which serves adolescents aged 13 to 18. When the Granville House program began in 1963, it was funded through private sources. It first began receiving federal money in 1972 under Title IV-A of the Social Security Act. In 1974, Title IV-A monies were replaced by Title XX monies, 42 U.S.C. § 1397 et seq., which were to become Granville House's major source of funding. In 1979, because of federal budget cuts in the Title XX program accompanied by an unwillingness or inability on the part of state or local governments to expand their share of funding for these programs, Granville House found itself less able to serve an indigent population. Granville House then began to make inquiries concerning the availability of Title XIX ("Medicaid") monies under 42 U.S.C. § 1396 et seq. Accordingly, Granville House began working to bring its facilities into compliance with the requirements of Title XIX. In the process, however, Granville House was informed by the Minnesota Department of Public Welfare, which is the State's Title XIX agency, that it could not be certified as a Title XIX facility because its facilities were institutions for mental diseases (IMDs). Under 42 U.S.C. § 1396d(a)(17)(B), federal reimbursement to states for care or services of individuals over 21 and under age 65 who are in an institution for mental diseases is prohibited. Granville House then filed this action challenging the State and federal government's purported classification of chemical dependency as a mental disorder and seeking a declaratory judgment that chemical dependency be defined as a "medical condition" eligible for Title XIX funds.

Initially, the State of Minnesota defended the suit. In the interim, however, the state was involved in a matter before the Departmental Grant Appeals Board of the Department of Health and Human Services, in which the State was denied federal financial participation in its expenditures for three residential facilities on the grounds that such facilities were IMDs. Docket Nos. 79–52–MN–HC and 79–89–MN–HC, November 30, 1981. The State appealed the Board's decision. *Minnesota v. Schweiker,* Civil 4–82–155 (D.Minn.). At

the same time, the State moved to have the *Minnesota v. Schweiker* matter consolidated with this action and requested a leave to file a crossclaim against HHS in this action. Both motions were granted. Both Granville House and the federal government have moved for summary judgment. The federal government seeks dismissal of this action on the ground that the plaintiff has failed to state a claim upon which relief can be granted as there is at present no case or controversy as required by Article III of the United States Constitution because this action is not ripe for judicial review. Furthermore, the federal government argues that the plaintiff cannot demonstrate it has been injured in fact by any action of the federal government and therefore lacks standing to assert this action. In the alternative, it argues that the Secretary's classification of chemical dependency is a valid and binding interpretation and should be followed. Granville House argues that alcoholism and chemical dependency should not be considered mental disorders.

This Court declined to rule on these motions without first taking evidence on the question of whether chemical dependency, and in particular alcoholism, should be classified as a mental disorder. On May 26, 1982, and June 9, 1982, testimony was heard on this question. Sometime later both parties submitted Recommended Findings of Fact and Conclusions of Law.

## II. JURISDICTION

### A. Ripeness

The judicial power of the United States extends only to "cases" and "controversies." Article III, United States Constitution. A substantial doctrine of law has been derived from these two words. *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (bar against advisory opinions); *Liner v. Safco, Inc.,* 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964) (bar against deciding moot questions); *United States v. Johnson,* 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (bar against collusive suits); *Pacific States Telephone & Telegraph Co. v. Oregon,* 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377

(1912) (bar against deciding political questions). This doctrine has been refined to a point where each word suggests a slightly different limitation. *Flast v. Cohen,* 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 ("embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations.") The term "justiciability" has been adopted to denote this dual limitation placed upon federal courts by the case-and-controversy doctrine. *Id.* at 95, 88 S.Ct. at 1949. Courts are, therefore, accustomed to inquiring whether a particular matter is justiciable.

■ An inquiry into whether a particular matter is ripe for adjudication involves "a *prospective* examination of the controversy which indicates that future events may affect its structure in ways that determine its *present* justiciability, either by making a later decision more apt or by demonstrating directly that the matter is not yet appropriate for adjudication by an article III court." Laurence H. Tribe, American Constitutional Law 61 (1978).

■ The federal government argues that it is more appropriate to await the more fully developed factual record emanating from the administrative agency charged with responsibility for interpreting and enforcing the statutory framework under review. Presumably, the force behind this reasoning is the assumption that by proceeding through the administrative process Granville House may prevail and obtain the end it seeks. Nevertheless, the Court is skeptical that such a result has even a remote chance of occurring. The federal government has repeatedly noted in interrogatories that, in its opinion, "the conditions of alcoholism or chemical dependency necessarily fall within the category of mental illness or mental disorder." *See* Interrogatory No. 8 and Answer No. 8, Defendant Health and Human Services' Answers to Written Interrogatories, January 13, 1981. It has been the federal government's posture all during the course of the discovery, motions and trial in this case that the plaintiff is disqualified from asserting

its residents because of the "mental disorder" inherent in the disease of chemical dependency. The Court was unable to obtain any assurance from counsel that the question of whether chemical dependency is a mental disorder is open for debate. For a case to be ripe, all that need be determined is whether the complained of conduct will in all likelihood occur. *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974); *Pennsylvania v. West Virginia,* 262 U.S. 553, 592, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923).

Furthermore, this matter does not present an abstract question. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Nonjusticiable declaratory actions are generally characterized as hypothetical; i.e., as presenting abstract questions. This characterization is justified as such declaratory actions usually depend upon suppositions contrary to fact or wholly speculative suppositions. For a court to rule under these circumstances would in effect be to issue an advisory opinion. This case, however, presents issues of sufficient immediacy and reality to justify the issuance of a declaratory judgment. The issues in this action have been pressed before this Court in the context of full adversarial argument and therefore the question for resolution emerges focused and precisely framed. *See United States v. Freuhauf,* 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 746 (1961).

### B. Standing

■ To assert standing in a matter requires a party to show it "has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). In order for a party to have a sufficient stake in a controversy, that party must show that the challenged action has caused him "injury in fact," economic or otherwise. *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 473–77, 60 S.Ct. 693, 696–98, 84 L.Ed. 869 (1940); *Boating Indus-*

*try Ass'n v. Marshall,* 601 F.2d 1376, 1380 (9th Cir.1979). The standing requirement, to some extent, addresses the same concerns raised by the ban against advisory opinions. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) (for a party to meet the requirement of injury in fact, he must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult . . . questions.")

■ The federal government maintains that Granville House cannot demonstrate that any federal action has caused them injury in fact. They argue that Granville House is not currently being deprived of Medicaid funding because of any action taken by the Department of Health and Human Services. The evidence, however, indicates that on two separate occasions, the plaintiff had applied for Medicaid funding and has been denied such funding by both defendants, each citing the other as authority for the proposition that chemical dependency is a mental disorder. This Catch-22 has brought the plaintiff to the brink of bankruptcy. It has had to forego treating the poor in favor of individuals of the middle and upper class whose broad medical insurance plans provide a narrow margin of survival. Thus, the plaintiff has had to withdraw from its primary mission of treating the poor and embark upon a perilous path of survival based upon third-party insurance programs. Upon the State's action granting Team House certification as an Intermediate Care Facility and its repeated assertions that in its view all the Granville House facilities were certifiable as such, the Court must conclude that the only obstacle in the plaintiff's path is the federal government's characterization of chemical dependency as a mental disorder. As recorded above, the plaintiff has suffered an injury in fact. To require it to proceed through the administrative process would only compound its injury without any realistic chance of favorable outcome.

## III. DISCUSSION

As the great bulk of the testimony was specifically directed at the issue of alcoholism rather than the more inclusive topic of chemical dependency and because all parties concerned seemed to agree that what was true of the former was, for the purposes of the present dispute, true of the latter, the Court will, for convenience sake, simply refer to alcoholism.

For the most part, alcohol and other drugs have played an exculpatory role in criminal actions. Our criminal law textbooks are replete with cases where the defense of intoxication was pled to negate a particular element of an offense. *See* S. Kadish and M. Paulsen, *Criminal Law and Its Processes* (3rd 1975) 91–93, 237–41, 443–449, 576–584. Alcoholism, as opposed to intoxication, has also played an established exculpatory role in our criminal law. In the 1950s and 1960s it was not uncommon for states to enact statutes making it a criminal offense for a person to be addicted to the use of narcotics. These so-called "status" crimes were ultimately invalidated as cruel and unusual punishment because states recognized narcotic addiction to be an illness which may be contracted innocently or involuntarily. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The most complete discussion of alcoholism by the Supreme Court came in a challenge to Texas' criminal statute forbidding public intoxication. In *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) the Supreme Court distinguished *Robinson* on the grounds that it was not being an alcoholic that was being sanctioned but rather being drunk on a particular occasion and appearing so in public. *Id.* at 532, 88 S.Ct. at 2154. The defendant had argued that because he was a chronic alcoholic his appearance in public while drunk was not of his own volition. *Id.* at 517, 88 S.Ct. at 2146. The Court upheld his conviction reasoning that the current state of medical knowledge did not enable it to conclude that the defendant, being a chronic alcoholic, suffered from an irresistible compulsion to drink and to get drunk in public such that he was utterly unable to control his performance of either or both of these acts and thus cannot be deterred at all from public intoxication. *Id.* at 535, 88 S.Ct. at 2155. The Court, at another point, noted

> "the inescapable fact is that there is no agreement among members of the medical profession about what it means to say that 'alcoholism' is a 'disease' .... Debate rages within the medical profession as to whether 'alcoholism' is a separate 'disease' in any meaningful biochemical, physiological or psychological sense, or whether it represents one peculiar manifestation in some individuals of underlying psychiatric disorders."

*Id.* at 522, 88 S.Ct. at 2149. The debate continues, although much has been discovered in the intervening fourteen years, and it is to the substance of that debate that we now turn.

On one level, the debate appears to take the form of turf skirmishes. The American Medical Association (AMA), since 1957, has classified alcoholism as a physical disease. The American Psychiatric Association (APA), in the Third Edition of its *Diagnostic and Statistical Manual of Mental Disorders* (DSM–III), lists alcoholism as a mental disorder. The World Health Organization, in the Ninth Revision of its *International Classification of Diseases* (ICD–9), also categorizes alcoholism as a mental disorder. However, because the APA has assumed the responsibility, for many years, of providing a revision of the mental disorders section of the ICD, the classification should not be treated as a separate examination of the problem. Basically, the dispute breaks down as one between the physicians and the psychiatrists. Because the federal government chooses to define mental diseases as those listed under the heading of "mental disorders" in the ICD–9, Granville House finds itself before this Court seeking declaratory relief. *See Field Staff Information and Instruction Series* (FIIS), FY–76–44.

Medical professionals classify diseases for a number of reasons. Dr. Robert L. Spitzer, the federal government's expert, enu-

merated at least four distinct purposes for disease classifications: (1) to provide professionals with a language with which to communicate with each other, (2) to identify the clinical characteristics of the different disorders, (3) to state what is known about the etiology and the relationship between the different disorders, and (4) to assist in the development of guidelines for treatment of the different disorders. A number of the plaintiffs' experts testified that the major purpose behind the ICD–9 and the DSM–III classification schemes was to aid insurance reimbursement. Their contention was buttressed by the fact that classifying alcoholism as a mental disease does not aid in its treatment, as typical psychological/psychiatric treatment methods are of little value.

As Dr. Robert Frederick Premer, Chairman of the Board of the Johnson Institute, testified on behalf of the plaintiff: "We all recognize that people get together and classify diseases; and a few years later they get together and reclassify them." Alcoholism has been no exception. Prior to 1957 the medical community did not consider alcoholism an illness. The prevalent view then was that alcoholism was indicative of moral decay and that alcoholics were simply drunkards or moral reprobates. The disease concept of alcoholism did not become widely accepted until the 1960s. *See* E. Jellinek, *The Disease Concept of Alcoholism* (1960).

In an attempt to determine the nature of the disease the APA has recently completed its third classification scheme. The first attempt by the APA to classify the disease (DSM–I) resulted in alcoholism being embedded among the Personality Disorders, under the subheading Sociopathic Personality Disturbances, along with Antisocial and Dyssocial Reactions and Sexual Deviation. Needless to say, this did not advance the cause of treatment, but rather served to reinforce the moral stigma already attached to the disease. The second classification attempt, DSM–II, still listed alcoholism as a Personality Disorder and though it was kept distinct from a direct association with antisocial behavior, it remained a part of the general grouping that included the sexual deviations. By direct association in DSM–I and by implication in DSM–II, alcoholism shared in society's jaundiced view with such other diagnoses as Antisocial Personality, Schizoid Personality, Homosexuality and Pedophilia. DSM–III moved away from associating alcoholism with other personality disorders. Instead, DSM–III grouped the Substance Use Disorders, including alcoholism, separately from other conditions. An examination of DSM–III reveals that its drafters drew heavily from behavioral research tracing typical patterns of consumption, including binge drinking, maintenance drinking and pathological patterns of use including the diverse behavioral consequences of excessive drinking explored by behavioral researchers.

This behavioral approach was echoed by Dr. Spitzer, the chairperson of the overall task force that developed the substance use disorders grouping for DSM–III. The task force was comprised of six or seven psychiatrists and a sociologist. Dr. Spitzer noted that abnormal behavior is the subject matter of psychiatry. He also stated that "the concept of mental disorder involves any behavioral abnormality" and because alcoholism is characterized by symptoms that are psychological or behavioral, under Spitzer's definition it is a mental disorder. Dependence, defined as the inability to live one's life without expressing a compelling desire to ingest some intoxicating agent, so the argument goes, is a psychological symptom and therefore so is the disorder it characterizes. According to Dr. Spitzer, there are no physical, laboratory tests that can determine whether someone is an alcoholic. Rather a diagnostician must rely upon the patient explaining his subjective feelings or upon direct observations of the patient's behavior. Therefore, because the predominate symptoms of alcoholism are patterns of abnormal behavior, the condition is considered mental.

This behavioral/symptomatic approach to classification has its shortcomings. There are many disorders or diseases which cause those afflicted to exhibit bizarre psychologi-

cal behavior but for which one is hard-pressed to conclude are mental. For example, lead poisoning and renal failure are characterized by aberrant behavior. Dr. Spitzer remarked that, to the extent that such conditions are typically manifested by abnormal behavior, they too are mental, although they would be "Organic Mental Disorders" because of their physical etiology. At another point, however, he concluded that "if there were a simple and totally effective treatment—physical treatment—then it is very possible that alcoholism would be taken off [the mental disorder list]." For example, pellagra, a vitamin deficiency, which can result in abnormal behavior, is considered outside the realm of mental disorders because it is effectively treated by administering a Vitamin B replacement. Similarly, the removing of the chemical agent alcohol from the alcoholic's system will result in the cessation of most abnormal behavioral manifestations. In that sense, like the case of pellagra, we possess a physical treatment for alcoholism. Thus, Dr. Spitzer appears to be saying that, at least in some cases, a condition may be classified as mental merely as a consequence of our ignorance concerning its treatment.

The behavioral/symptomatic approach to classification, first outlined by Dr. Spitzer, is not coextensive with the more epistemological view of disease/disorder classification he develops later in his testimony. Presumably, under the former approach alcoholism would forever be classified as a mental condition unless miraculously alcoholics stopped exhibiting behavior common to the condition and no longer suffered from dependence. Of course, such alcoholics would be a rather unusual breed, particularly given that the compulsion to drink alcohol would no longer be a necessary element of the condition. Because the latter approach focuses upon the treatment of the condition, it is subject to change as our knowledge of alcoholics and alcoholism becomes more complete. It is unclear which classification approach Dr. Spitzer was relying upon to justify his conclusion that alcoholism is a mental disorder. However, it is

the Court's opinion that both are beset with conceptual, as well as clinical, deficiencies.

The behavioral/symptomatic approach, as suggested above, suffers from over-inclusiveness. A large variety of conditions display abnormal behavior patterns. As Dr. Richard Olin Hezilman testified, syphilis was once thought to be a form of mental illness. Many thyroid diseases and brain tumors also manifest themselves through psychiatric symptoms. Even a sustained lack of sleep can commonly result in significant personality changes and even hallucinations. The mere fact that individuals commonly exhibit such behavior as a result of a sustained sleeplessness should not necessarily give rise to the conclusion that they suffer from a mental disorder. An inability to sleep may be the result of an underlying mental disorder, but it could certainly have other causes. The same is true of the inability to do without drink. Yet, as Doctor Premer testified, the majority of alcoholics have no psychiatric diagnosis. In other words, they generally do not suffer from both alcoholism and manic-depressiveness or some other psychiatric disorder. Furthermore, alcoholism cuts across all personality types. Dr. Hezilman testified that it is impossible to explain addiction in psychological terms. Finally, Dr. Daniel J. Anderson, Director of the Hazelden Foundation, testified that following detoxification, i.e. the withdrawal of the intoxicating agent, most maladaptive behavioral manifestations disappear.

It is illustrative to compare the diagnostic cues in DSM–III with those set forth by the National Council on Alcoholism (NCA) (1972). The NCA criteria reflect the richness of clinical detail gathered by individuals who have worked with chronic alcoholics over many years. One knowledgeable professional characterized the difference in the following manner:

"While the drafters of DSM III chose to define alcohol abuse and dependence extremely parsimoniously, choosing for the most part to ignore research by both basic and applied scientists identifying 'markers' of alcoholism both behavioral

and physiological, the developers of the National Council on Alcoholism criteria for the diagnosis of alcoholism include 28 major and 58 minor 'physiological, clinical, behavioral, psychological, and attitudinal' criteria further subdivided by diagnostic level of confidence. Reflecting the predominant view of the NCA that alcoholism is a physical disease, these criteria are heavily weighted in the direction of physiological and clinical signs or symptoms of the disorder. In view of the influence of the NCA in the field and the widespread acceptance of its criteria by clinicians working in the field, it is surprising that more extensive use of the NCA criteria was not made by the drafters of DSM III."

Peter E. Nathan, *Advances in Alcoholism,* Vol. 1, No. 15 (Jan. 1980). It is interesting to note that those treating alcoholism use the predominately physiological and clinical criteria of the NCA rather than DSM–III criteria. This was fully supported by all of the experts. Dr. Spitzer, the government's expert, recognized on several occasions that there exists no effective psychiatric treatment for alcoholism. Mr. Nathan concludes his analysis of DSM–III by remarking:

"DSM III, unswayed by the tidal wave of research findings that have followed the federal alcoholism funding effort, defines alcoholism very parsimoniously and conservatively, relying on signs and symptoms that are age-old in their acceptance by the field and eschewing newer behavioral, physiological, and psychological cues that are the products of contemporary research efforts."

P. Nathan, *Advances in Alcoholism, supra.* This criticism reveals a rather slowly maturing and somewhat myopic taxonomic system. As a science becomes more sophisticated, it is less typified by predominantly observational statements and more by theoretical statements. This accounts for the exponential growth of mathematics in the physical sciences. "In medical science, the development from a predominantly descriptive to an increasingly theoretical emphasis is reflected, for example, in the transition from a largely symptomatological to a more etiological point of view." Carl G. Hempel, *Aspects of Scientific Explanation,* p. 140 (1965).

The federal government's expert, Dr. Spitzer, opined that the etiology or cause of alcoholism was irrelevant to our inquiry. Our ignorance as to a condition's cause leads to the labeling of the condition as a "disorder." Once we know the cause of a condition, it is called a "disease." Some medical professionals, Dr. Spitzer continued, dispute the claim that alcoholism is a disease on the theory that it is unknown why some people become alcoholics after consuming excessive amounts of alcohol and others do not. These medical professionals choose to characterize alcoholism as a disorder. Those labeling it a disease counter that alcohol is a cause of alcoholism and the progression of the condition, if left untreated, is known.

Any classification system which purports to render some order to a collection of medical conditions but which ignores their causes is unsound. This is particularly true where one of the primary aims of any medical taxonomic scheme is to aid in treatment. Therefore, as many of the plaintiff's expert witnesses suggested, it should come as no surprise that psychiatrists have yet to develop an effective treatment for alcoholism.

The only successful treatments to date are based upon the Alcoholics Anonymous model. This model calls for the absolute abstinence from drugs or alcohol. That abstinence will result in the complete arrestment of the alcoholic's illness. The failure to observe abstinence will result in continued mental and physical deterioration probably leading to early death. This deterioration progression is quite predictable being characterized by a set of reproducible progressive pathological changes in the body.

Dr. Thomas G. Briggs, a practicing physician who specializes in alcoholism treatment, testified that the physiological changes accompanying the active disease of alcoholism are quite extensive. If left untreated, alcoholism can result in any number of physical ailments from cirrhosis of

the liver to brain damage. All the organs of the body are affected by alcohol. Alcoholism is the third leading cause of death in the United States. The Court is unaware of any mental illness that so directly and persistently results in death.

To a certain extent this debate is reminiscent of the mind-body problem which has occupied philosophers for centuries. With the doubtful exceptions of idiots and infants in arms, every human being has both a body and a mind, or so our common sense tells us. The difficulty arises when attempting to delineate the boundaries of each particular realm. In some ways alcoholism straddles both realms. Disease of the body, if severe and continuing, will in time affect the mind. Yet alcoholism and chemical dependency need not be theoretical shuttlecocks which are forever being bandied about from the physiologist back to the psychiatrist and from the psychiatrist back to the physiologist. The sole fact that a condition is accompanied by abnormal behavior does not justify its classification as mental.

The great bulk of the testimony supports the conclusion that alcoholism is a diagnosis of a primary disease. It cannot be understood as a secondary effect of other problems. The disease is predominately physical, as opposed to mental, in nature. It has its own distinct character, symptoms and treatment. The only successful treatment programs are based upon the physical disease concept. Minnesota, as many of the experts noted, has been a pioneer in alcoholism research and treatment. As early as 1907, the Minnesota state legislature instituted a two percent tax on liquor to finance Willmar State Hospital, which in 1912 began to develop treatment methods for alcoholism. As recently as the early 1970s, the Minnesota legislature required all state-based insurance companies to include coverage of chemical dependency treatment within their medical plans. As a result, Minnesota hosts the most extensive network of chemical dependency treatment programs of any state. Included in this network are the Hazelden Foundation, St. Mary's Rehabilitation Center, and the Johnson Institute. All these institutions employ a treatment model based upon alcoholism as a physical disease. Indeed, as Dr. Briggs stated, the concept of alcoholism and other forms of chemical dependency as mental disorders had been discarded years ago by all who were familiar with modern treatment programs. It is, therefore, the Court's conclusion that the Federal Government's classification of alcoholism and other forms of chemical dependency as mental disorders is arbitrary and capricious. Furthermore, even if this Court were to rule otherwise, there is no assurance that the Federal Government's characterization of the three facilities in question as "institutions for mental diseases" is appropriate. *See State of Minnesota v. Schweiker,* Civ. No. 4–82–155 (D.Minn. Aug. 25, 1982).

## IV. CONCLUSION

The Court, based upon the foregoing arguments and after having heard the testimony offered by the parties, and upon all the records, files and proceedings in this matter, hereby makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I

That plaintiff is a private, nonprofit corporation organized under the laws of the State of Minnesota and has been granted tax exempt status as a 501(c)(3) corporation by the Internal Revenue Service of the United States Government.

#### II

That the plaintiff operates three residential halfway house treatment programs: the Jane Dickman House for women, the Team House for young men, and the Warren Eustis House for adolescents. That each of the facilities of the plaintiff admit patients for treatment under a primary diagnosis of chemical dependency.

#### III

That the plaintiff's facilities are licensed by the State of Minnesota under Depart-

ment of Public Welfare Rule 35 for the care and treatment of chemical dependence.

### IV

That each of the plaintiff's facilities is accredited by the Joint Commission on Accreditation of Hospitals as a psychiatric facility.

### V

That the plaintiff only admits patients who have a primary diagnosis of chemical dependency. That all patients who are referred to its facilities for treatment, whether by county Welfare Departments, hospitals, physicians, probation officers, or from individual referrals, have completed primary treatment in licensed facilities under a medical diagnosis of chemical dependency.

### VI

That the primary treatment facilities from which plaintiff accepts referrals are all licensed by their respective states and each utilize a medical model; each must have a medical director and must establish a medical diagnosis for each patient. Each must maintain medical records documenting their diagnosis and their treatment plan, and progress.

### VII

That plaintiff employs a physician as a medical director, Sharon Woods, M.D., who has the responsibility to review and confirm all such diagnoses of chemical dependency.

### VIII

That the diagnosis of chemical dependency, or alcoholism and drug dependency, is a diagnosis of a primary disease.

### IX

That the primary diagnosis of chemical dependency, or alcoholism or drug dependency, is a diagnosis of a disease process and such diagnosis, as used by the plaintiff and generally in Minnesota licensed chemical dependency treatment facilities, does not imply or include diagnoses of mental disorders or mental diseases.

### X

That plaintiff's treatment facilities are not institutions for the treatment of mental disorders or mental diseases.

### XI

That primary chemical dependency and primary mental disorders or diseases may occasionally co-exist in a single patient; that plaintiff employs a medical director and a psychiatric consultant for the purpose of establishing such dual primary diagnoses. That plaintiff only treats persons accepted for treatment for a diagnosis of chemical dependency. Patients who have co-existing mental disorders are referred out separately for treatment and such psychiatric treatment is not a part of the plaintiff's program.

### XII

That each of the Granville programs are eligible for intermediate care facility certification; that the Team House program is certified by the State of Minnesota as an intermediate care facility.

### XIII

That the sole reason that defendant refuses to fund patients of plaintiff's programs under Title XIX of the Social Security Act rests on the claim that plaintiff's patients, suffering from the disease of chemical dependency, are suffering from a mental disorder or disease and are therefore disqualified under the provisions of Title XIX.

### XIV

That defendant State of Minnesota has conceded that plaintiff's patients suffer from a medical disease and that such diagnosis of chemical dependency does not imply a mental disease or disorder.

### XV

That plaintiff's facilities for the treatment of chemical dependency offer services

638

which are equal to or superior to that offered by acute care hospitals in Minnesota and elsewhere. That the per diem charge for plaintiff's program for each resident ranges from $35.00 to $52.00 per day under current fee schedules. The current administration of the Title XIX program by the defendants results in the same class of patients as treated by plaintiff being admitted to acute care hospitals under the same diagnoses, where their per diem charges are substantially larger.

## XVI

That the current Title XIX program administered by the State of Minnesota under the general guidelines of defendant Health and Human Services requires that patients receiving reimbursement for medical services be housed in a program licensed as an intermediate care facility. That such rules and policies promulgated by the defendants include requirements such as handrails, bedside buzzers, the regular attendance of registered nurses and the like, some of which rules and regulations are not relevant nor do they serve any rational purpose in terms of the physical and mental health of the patients being treated by plaintiff.

## CONCLUSIONS OF LAW

1. That at such time as defendant State of Minnesota shall certify plaintiff's facilities, i.e., Team House, Jane Dickman House, and Warren Eustis House, as intermediate care facilities, the residents of such programs shall be entitled to Title XIX assistance from the defendants.

2. That "chemical dependency," as defined by plaintiff's admission standards, is a disease and, as used by plaintiff's program, chemical dependency is a primary diagnosis.

3. That the Federal Government's classification of alcoholism and other forms of chemical dependency as mental disorders is unreasonable and therefore the federal defendant's characterization of plaintiff's facilities as "institutions for mental diseases" is arbitrary and capricious.

4. That the defendants are enjoined from refusing to accept residents of plaintiff's programs, i.e., Team House, Jane Dickman House, and Warren Eustis House, as eligible for payments under the State of Minnesota's Medicaid program and the federal government's Title XIX reimbursement program for medical assistance.