**SOTRANA–TEXAS CORP., Plaintiff,**

v.

**Clinton A. MOGEN; Bernice H. Mogen; Alice M. Madson, Ronald J. Mogen; Evelyn Chapman; Fayette Oil & Gas Corp.; and Ferguson Oil and Gas Co., Inc., Defendants.**

**No. A1–81–209.**

United States District Court,
D. North Dakota,
Southwestern Division.

Nov. 19, 1982.

As Amended Jan. 7, 1983.

Nilles, Hansen, Selbo, Magill & Davies, Ltd., Frank J. Magill, Fargo, N.D., for plaintiff.

Bjella, Neff, Rathert, Wahl & Eiken, Paul W. Jacobson, Williston, N.D., for Fayette Oil & Gas Corp.

Pearce, Anderson & Durick, William P. Pearce, Bismarck, N.D., for Ferguson Oil & Gas and Dome Petroleum Corp.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

In this diversity action, plaintiff seeks judgment declaring that the Mogen federal oil production unit is valid. Defendants resist, arguing that the unit is invalid because it was formed in bad faith.

### I. Background

On February 18, 1976, the Mogens executed three oil and gas leases, and on April 23, 1976, a fourth lease, all to Agri-Empire for five year terms. William Champion, an agent for Agri-Empire, negotiated the leases with Clinton Mogen, the Mogen family member that handled the leasing of family property. Apparently, on the day that the first three leases were signed, Champion and Mogen went over the leases together, discussing the clauses in the leases, including the clause that allowed the lessee to form an oil production unit of the leased land. The unit clause provided:

> [L]essee shall have the right to unitize, pool, or combine all or any part of the above described lands as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative unit of development or operation . . . and this lease shall not terminate or expire during the life of such plan or agreement.

On September 27, 1976, Agri-Empire assigned its interest in the Mogen lease to Bridger Petroleum Corporation, but reserved an overriding royalty of 5% of ⅝ths. Effective January 1, 1980, Bridger Petroleum was merged into Home Petroleum Corporation (hereafter Home). In April 1980, Home decided to drill a well in the section adjacent to the areas covered by the Mogen lease. Drilling commenced on October 26, 1980, but Home later abandoned the well as unproductive.

On February 2, 1980, Mogen top-leased[1] the land covered under the original four leases to Yockim, retaining for himself a ⅛th royalty. Yockim then conveyed his top-lease interest to the defendants Fayette Oil & Gas Corporation and Ferguson Oil and Gas Company, Incorporated.

In November 1980, Home began considering the formation of a federal unit on the leased land in order to extend the leases beyond their five year term. Home's geological section indicated that this land would be a likely spot to form a federal unit and Home's management initiated preparation for such a unit.

An oil production unit is a pooling of lands covering a common oil reservoir for the purpose of extracting that oil in the most efficient manner. The unit increases efficiency in oil recovery because it eliminates the drilling of unnecessary wells and thereby conserves resources by eliminating the underground waste and loss of oil that would result from unnecessary wells. Once a unit is formed the life of the primary lease is extended until the unit is no longer operative and during this time the profits from the oil recovered are distributed among mineral and leasehold owners according to a complicated formula that takes into account surface acreage among other factors.

On December 3, 1980, Home submitted its application for a federal unit to the United States Geological Survey (USGS).[2] Home claims that it mailed a copy of the unit plan to the Mogens for their ratification about December 5, 1980. The Mogen family refused to ratify the unit plan, apparently after talking to Yockim. In accordance with the power granted to the lessee under the Mogen leases, Agri-Empire and Home committed the Mogen's interest in the leased land to the Mogen unit. On December 23, the USGS approved the Mogen unit.

On October 5, 1981, Agri-Empire and Home assigned their interests in the Mogen leases to Sotrana-Texas Corp., the plaintiff in this action. The USGS has extended the term of the Mogen federal unit to January 30, 1983.

## II. *Discussion*

The plaintiff lessee asks this court to declare valid the federal unit formed on the leased premises. This declaration would have the effect of extending the primary lease, which provides that "this lease shall not terminate or expire during the life of the (unit) plan or agreement."

The controlling law concerning the validity of oil production units stems from two Tenth Circuit cases decided in 1954, *Boone v. Kerr-McGee Oil Industries,* 217 F.2d 63, and *Phillips Petro. Co. v. Peterson,* 218 F.2d 926. The first case, *Boone* raised the issue whether a unitization agreement made by the lessees would be valid against the lessors who object to the formation of that unit. The court held that the test for the validity of the unit was whether the lessees exercised "good faith" in forming the unit. 217 F.2d at 65. The court stated that good faith "simply means that what is done must be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power (to unitize)." Since the purpose of forming a unit is to develop the oil and gas resources with greatest efficiency, the court then must determine whether the lessee's intention in forming the unit was to increase the efficiency of recovery.

The *Boone* court, however, applied this principle in a very restrictive manner. After stating that the law presumes good faith and that the lessor must affirmatively establish bad faith, 217 F.2d at 65, the court went on to examine the evidence which suggested that unitization would be an efficient method of oil recovery. From this evidence, the court apparently, without

---

1. A top lease is essentially a future interest in a leasehold that takes effect upon the expiration of the preceding lease, and is taken subject to the risk that the preceding lease might be extended by drilling or unitization.

2. This unit is a federal unit because federal land falls within its boundaries.

stating as much, inferred that the lessee's intention was to increase the efficiency of gas recovery. The court did not attribute much, if any, significance to the fact that the unit was formed just prior to the termination of the lease, nor did it discuss whether the unit would work to the lessee's economic advantage at the expense of the lessor. In sum, the reality behind the court's words appears to be that the unit would be upheld if the geology indicated that the normal advantages of unitization would result under these circumstances. Since, in *Boone* the geology supported the unit, the court upheld it.

At first blush, the court in *Phillips* appears to make a significant change in the *Boone* analysis when it states that in addition to the requirement that the lessee act in good faith, the lessee must act with due regard for the interests of the lessor:

> A lessee is bound by implied covenants in the lease . . . in the case of unitization, to act fairly and in good faith, with due regard for the lessor's interests, and to provide for a fair apportionment of the oil produced.

218 F.2d at 964 (footnotes omitted).

Yet despite its statements that the lessee owes a "high degree of loyalty" to the lessor, the court took a very restrictive position on the meaning of "due regard." In finding that the lessees exercised "due regard for the lessor's interests," the court only examined the extent to which the unit would increase the efficiency of oil production, the very same question to which the *Boone* court limits its inquiry. 218 F.2d at 964–65. The *Phillips* court notably did not address whether the lessor's economic interests would be advanced overall by the formation of the unit, the primary consideration that one would normally take into account in determining whether the lessee was acting adversely to the interests of the lessor. Thus, as to the requirement of "due regard," it appears that the *Phillips* court did not add anything meaningful to the test of "good faith" advanced in *Boone*. Rather, the court again acted under the principle that the unit is to be upheld if the geology

shows that unitization would increase the efficiency of oil recovery on the land in question.

This court is not aware of a reported decision that operates under a different analysis. The defendants point to *Amoco Production v. L.T. Underwood,* 558 S.W.2d 509 (Tex.Civ.App.1977). However, this case rather than employing a different analysis follows the *Boone* and *Phillips* line of reasoning. The court in *Underwood* upheld a jury's finding of bad faith precisely because the geology did not fit the configuration of the unit formed, the argument that appellee advanced in favor of affirmance. The court stated:

> The jury could have properly concluded from the evidence and inferences listed above that the configuration of the unit was not established in good faith, but designated as stated in Rothwell's letter to Amoco, "to hold the majority of leases" which would otherwise expire on May 29, 1975.

558 S.W.2d at 513.

■ This court will follow the restrictive analysis developed in *Boone* and *Phillips,* directing its consideration to the question whether the geological data justifies the unit, without directly addressing the question whether the lessee intended to form the unit for the purpose of increasing oil recovery from the land.

The reasons for following this analysis are many. First, subjective intent is difficult, if not impossible, to show where the lessee almost always will be motivated by his economic interest coupled with his knowledge that unitization normally results in the most efficient oil recovery. Further, it is doubtful except perhaps for leases with very long terms, that lessees would form units if the formation of those units did not extend the life of the leases. In the ordinary case, as a matter of practical reality, extension of the lease will almost always be a major factor in the lessee's decision to form the unit. So it can not be said with any certainty that the lessee unitized for the primary purpose of increasing oil recovery. Thus, except for extraordinary cir-

cumstances which are not present here, the courts have good reason to limit consideration to the more objective and defined determination of whether the geology supports the unit configuration.

Second, the lessor would not be any worse off even if the lessee formed the unit for some other purpose than maximizing oil recovery, if in fact the unit actually increased oil recovery. The principal object of concern to the lessor is the geological justification, not the intention of the lessee.

Third, restricting consideration to the geological question, rather than allowing consideration of the lessor's economic interests, has the effect of encouraging unitization and thereby promoting the public interest. Unitization is in the public interest since it allows for the conservation of oil resources and encourages development of those resources which otherwise might not occur.

Fourth, to impose a stricter test on the validity of units would go well beyond the contractual provisions. Most of the unitization clauses, like the clause here, allow unitization when the lessee judges it "necessary or advisable" to unitize, a judgment which must necessarily be grounded on the basis of geological data.

■ Prior to examining the geological justification, a preliminary issue must be discussed. Defendants claim that the unitization is unenforceable because the lessor Clinton Mogen did not consent to it when he signed the lease. They claim that Mogen did not understand the clause and that the agent of the lessee did not explain it to him.

This court believes that Mogen did understand the unitization clause and even if he didn't, that the original lessee did not use any misconduct in order to get Mogen to sign the lease. Mogen was familiar with oil and gas leases, having over ten years experience with oil leasing and having signed a prior lease with a unitization clause identical to the one here in question. Further, Mogen was a wary customer, careful not to get his land tied up in long leases, due to an experience that his father had when a single well extended the lease for a large tract of land. Mogen was also well-educated, working until retirement as a soil scientist all across the country. He apparently insisted on reading, and one would assume, understanding the leases that he signed.

As to the agent of the original lessee, his testimony that he met with Mogen and explained the unitization clause is corroborated by his detailed recollection of events and the notes he kept. Further, defendants do not allege that the agent attempted to hurry Mogen into signing the lease or exerted undue pressure on him to do so. For these reasons, this court finds that the unitization clause was binding on Mogen after he signed the lease.

■ Turning now to the geological issue, this court finds that the evidence adduced at trial indicated that the unit conformed to the existing geological structure, with one exception. Defendants' geologist Kilpatrick testified that the data would have justified including a larger area within the unit, specifically the southern half of section 22 and the northern half of section 27. He based this judgment on structural maps he made of the Sand Creek prospect as well as structural maps that Home had prepared. He pointed out a notable discrepancy between the structural map of the Sand Creek prospect Home prepared on April 14, 1980, and the structural map that Home submitted with its application for unitization on December 3, 1980. On the April map the 8350 foot sub-surface contour line extended into the northern half of section 27, but on the December map the 8350 foot contour line reached only the middle of section 22. This means that the 8350 line extended about a mile further south on the April map than it did on the December map. The defendants' geologist stated that he believed that plaintiff altered the December map because it had no leasehold interest in the southern half of section 22 and the north half of section 27.

Plaintiff attempted to explain this discrepancy by stressing that the maps were prepared by two different geologists and that interpretation among different geolo-

gists can vary. While this explanation is somewhat convincing, plaintiff's geologists did not state with any degree of particularity how it was that they arrived at such a different interpretation apparently from the same data. Thus, since the latest contour line appears to be drawn almost perfectly to fit the plaintiff's leasehold interests, this court believes that plaintiff might well have drawn the unit to suit its interests.

However, even if the unit had extended approximately another mile south, this fact would not have advanced the lessors' interests, since they also held no leasehold in this additional property. In fact, the smaller unit would be more likely to redound to the lessors' interests, since the proceeds therefrom would not have to be divided among additional parties. If anyone had cause to object to the unit, it would be those parties holding mineral interests in this area. And it appears that the proper remedy in their case would be to include them within the unit rather than to invalidate the unit.

For the reasons above stated, this court declares that the federal unit formed on the Mogen tract is valid and binding on all parties to the lease.

Judgment will be entered accordingly.

IT IS SO ORDERED.