STATE OF MISSOURI; Joseph J. O'Hara, Director; and Missouri Department of Social Services, Appellants,

v.

Otis R. BOWEN, Secretary, Department of Health and Human Services; Dorcas R. Hardy; Al Kemp; Merle Schmidt; Linda Carson, Appellees.

No. 86–1686.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1986.

Decided March 2, 1987.

Gregory W. Schroeder, Jefferson City, Mo., for appellants.

Marcus H. Christ, Baltimore, Md., for appellees.

Before JOHN R. GIBSON, FAGG, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

The State of Missouri appeals from an order of the district court[1] granting summary judgment in favor of the Secretary of the Department of Health and Human Services ("DHHS").[2] In granting the Secretary's motion, the court thus denied Missouri's claim that the DHHS' noncompliance with its own regulations—failing to act within the 60–day time period in 45 C.F.R. § 95.511 on a cost allocation plan amendment submitted by Missouri—constituted approval of the amendment. Additionally, the court held that Missouri did not have to exhaust its administrative remedies as a precondition to the court's hearing of the above claim. For the reasons discussed below, we affirm.

## I. BACKGROUND.

### A. Statutory and Regulatory Framework.

This case arises under Title IV–E of the Social Security Act, 42 U.S.C. § 670 et seq., which establishes a cooperative state-federal foster care and adoption assistance program for children. In order to participate in the program, the state must submit a plan to the DHHS which meets the criteria set forth in 42 U.S.C. § 671. Missouri, through its Department of Social Services, has participated in the program continuously since its inception.

Under Title IV–E, participating states become eligible to receive federal reimbursement for certain percentages of the pro-gram's operational costs. 42 U.S.C. § 674. Federal payments are made quarterly and are based upon the DHHS' estimate of the amount of federal financial participation to which the state is entitled. 42 U.S.C. § 674(d).

Because the various categorical assistance programs under the Social Security Act are interrelated, states participating in the Title IV–E program are required to make determinations of the amount of commonly incurred expenses that are attributable to each program in which there is federal participation. This process is known as the "allocation of costs." Under regulations promulgated by the Secretary, the state must submit a proposed cost allocation plan[3] and any plan amendments to the DHHS' Division of Cost Allocation ("DCA"). 45 C.F.R. §§ 95.507, 95.509.

After a plan is submitted, the DCA is required to notify the state of its findings:

The Director, DCA, after consulting with the affected Operating Divisions, *shall notify the State in writing of his/her findings. This notification will be made within 60 days after receipt of the proposed plan or amendment and shall either:* (1) Advise the State that the plan or plan amendment is approved or disapproved, (2) advise the State of the changes required to make the plan or amendment acceptable, *or* (3) request the State to provide additional information needed to evaluate the proposed plan or amendment. *If the DCA cannot make a determination within the 60–day period, it shall so advise the State.*

45 C.F.R. § 95.511(a) (emphasis added).

While a proposed plan or plan amendment is pending, the state may file claims for federal financial participation ("FFP") based on the pending plan, subject to retro-

---

1. The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri, Central Division. The courts decision is reported as *State of Missouri v. Bowen,* 638 F.Supp. 37 (W.D.Mo.1986).

2. The action arose upon cross-motions for summary judgment. Although the Secretary's motion was denominated as a motion to dismiss, the court, pursuant to Fed.R.Civ.P. 12(b), treat-

ed it as a motion for summary judgment. *Bowen,* 638 F.Supp. at 638 n. 1.

3. A cost allocation plan ("CAP") is defined as "a narrative description of the procedures that the State agency will use in identifying, measuring, and allocating all State agency costs incurred in support of all programs administered or supervised by the State agency." 45 C.F.R. § 95.505.

active adjustment if the approved plan differs from the proposed plan. 45 C.F.R. § 95.517(a).[4]

If a state is dissatisfied with the disposition of its plan, it may obtain administrative review on two levels. First, the state may appeal the DCA's decision to the Regional Director of the DHHS. 45 C.F.R. Part 75. Second, the state may obtain review of the Regional Director's decision by appealing to the DHHS' Grant Appeals Board ("GAB"). 45 C.F.R. Part 16.

### B. Factual Background.

The dispute in this case centers on a cost allocation plan amendment (the "Amendment") submitted by Missouri to the DCA on September 25, 1984.[5] The Amendment sought significant increases in the amount of federal financial participation in Missouri's Title IV-E programs, and according to

the Secretary, "radically altered the methods in allocating costs between the various state-administered Social Security Act programs."[6]

The Amendment sparked various communications between the parties over the next two months, wherein the DCA requested, and Missouri provided, additional information.[7] Despite these oral communications, the DCA did not make a written response to the Amendment until December 20, 1984, 26 days after the 60–day deadline in 45 C.F.R. § 95.511 had expired. The letter was prompted by a December 12, 1984 letter from Missouri, wherein Missouri asserted that the DCA's noncompliance with the regulation resulted in approval of the Amendment, and that it would begin to file claims under the Amendment, pursuant to 45 C.F.R. § 95.517.[8]

4. 45 C.F.R. § 95.517(a) provides as follows:
A State must claim FFP for costs associated with a program only in accordance with its approved cost allocation plan. However, if a State has submitted a plan or plan amendment for a State agency, it may, at its option claim FFP based on the proposed plan or plan amendment, unless otherwise advised by the DCA. However, where a State has claimed costs based on a proposed plan or plan amendment the State, if necessary, shall retroactively adjust its claims in accordance with the plan or plan amendment as subsequently approved by the Director, DCA. The State may also continue to claim FFP under its existing approved cost allocation plan for all costs not affected by the proposed amendment.

5. Appellants in this case are the State of Missouri, the Missouri Department of Social Services, and the director of that department. The parties are collectively referred to as "Missouri."
Appellees in this case are the Secretary of the DHHS, the Regional Director of the DCA, and various other lower officials in the DHHS. For purposes of clarity, we designate the respective agencies as such in our opinion.

6. The Secretary noted that one effect of the amendment was to increase Title IV-E claims for administrative expenses from fiscal year 1984 levels of $153,599 to $7,606,716 for fiscal year 1985. Total claims would be increased from $2,288,814 to $12,789,004 for the respective fiscal years.
At oral argument, Missouri explained the reason for the increases, noting that in previous years it was the practice of Missouri, and of other states, to transfer certain of its Title IV-E funds to other federally-funded programs oper-

ated by the state, such as Title IV-B programs. Prior to filing the Amendment, Missouri stated that it only needed to show the Secretary that it had sufficient costs incurred to fully utilize its remaining Title IV-E appropriations, less those which it transferred to other programs. Consequently, Missouri claims that it never had "incentive" to file and prove to the Secretary its total actual Title IV-E costs. When Missouri filed the Amendment, however, it had dropped the election to transfer a portion of Title IV-E appropriated funds to the other programs. Instead, Missouri sought to claim and capture all of its Title IV-E costs for the first time.

7. The district court found that there was "some oral communication" between Missouri and the DCA. *Bowen,* 638 F.Supp. at 39. The Secretary alleges in his brief, however, that "numerous telephone conversations" took place, and that one of these conversations resulted in Missouri sending, on October 25, 1984, additional information about the Amendment's analysis of salaries and benefits. The Secretary also claims that Missouri again sent salary information on November 29, 1984, at the DCA's request.

8. In the December 12, 1984 letter, Missouri acknowledged that it had verbal communications with the DCA concerning a possible extension of time for the DCA to consider the Amendment. Missouri stated, however, that it felt these verbal communications did not comply with the written notice requirements in 45 C.F.R. § 95.-511, and that it would not agree to any extension. Additionally, Missouri stated that this delay and any subsequent approval would disrupt the appropriations process in Missouri so as to place the program in serious jeopardy.

In the December 20 letter, the DCA stated that Missouri could, as it said it would, file claims for federal financial participation pursuant to 45 C.F.R. § 95.517. Additionally, the DCA responded to Missouri's "deemed approval" theory as follows:

Part 95.511(a) does not specify what happens if the DCA fails to advise the state that a determination will be made within the 60 day period. There were many verbal communications with several of your staff on this amendment. Even if your "assumed" approval is valid, any such approval is based on information provided by the state and is void if the information is found to be materially incomplete or inaccurate. The information provided by the state is incomplete. Please provide the following information and a revised amendment to reflect the following.

Letter from Merle Schmidt, Director of DCA, to Mr. Barnett A. Toan, Director of Missouri Department of Social Services (December 20, 1984).[9] The DCA required Missouri to submit the revised amendment containing the requested information by January 23, 1985. However, the parties met in January, after which the DCA sent Missouri a letter suspending the due date and stating that the Amendment would continue to be reviewed as originally submitted.

The parties continued negotiations regarding the Amendment during the next several months. On February 4, 1985, and on several occasions thereafter, Missouri submitted claims under the pending Amendment, but payments thereunder were never approved. On May 29, 1985, the DCA officially communicated its written disapproval of the Amendment and advised Missouri of its right to appeal the DCA's decision to the Regional Director and the Grant Appeals Board.[10]

On July 2, 1985, pursuant to 45 C.F.R. § 75.5, Missouri appealed the DCA's disapproval of the Amendment. After a hearing, the Regional Director affirmed the DCA's decision. On October 8, 1985, Missouri filed, pursuant to 45 C.F.R. § 16.7, a notice of appeal with the Grant Appeals Board.

On November 26, 1985, forty-nine days after appealing to the Board but with no decision having been entered by that body, Missouri filed suit in district court seeking a preliminary injunction requiring the Secretary to process its claims submitted under the Amendment. On April 1, 1986, upon cross-motions for summary judgment, the district court ruled in favor of the Secretary.

### C. District Court Proceedings.

In its complaint, Missouri alleged under two separate counts that the DCA's failure to act promptly on the Amendment foreclosed that agency from later disapproving it. In Count I, Missouri argued that the DCA's failure to give written notification within 60 days of the Amendment's submis-

---

**9.** Although the DCA does not mention the basis for its proposition that the plan could be "void," the Secretary, in his brief, cites 45 C.F.R. § 95.515, which provides in relevant part:

As a general rule, the effective date of a cost allocation plan amendment shall be the first day of the calendar quarter following the date of the event that required the amendment (See § 95.509). *However, the effective date of the amendment may be earlier or later under the following conditions:*

\* \* \* \* \* \*

(b) *The information provided by the State* which was used to approve a previous plan or plan amendment *is later found to be materially incomplete* or inaccurate, or the previously approved plan is later found to violate a Federal statute or regulation. In either situation, the effective date of any required modifica-

tion to the plan will be the same as the effective date of the plan or plan amendment that contained the defect.

45 C.F.R. § 95.515(b) (emphasis added).

Although the regulation does not appear to literally "void" a materially incomplete plan, it may alter the effective date of the plan under such a situation.

**10.** On June 25, 1985, the DCA and Missouri met to discuss submission of a new cost allocation plan amendment. On the next day Missouri submitted the new plan, which was eventually approved by the DCA on September 23, 1985. The approval provided for an effective date of July 1, 1984. According to the Secretary, this assured Missouri that there would be no gap in federal grant awards to the state.

sion, as required by 45 C.F.R. § 95.511, constituted "deemed approval" of the Amendment. As the district court noted, Missouri's "deemed approval" construction is purely a gloss put on the regulation by the state; the regulation does not expressly set forth what the effect of noncompliance would be. *Bowen*, 638 F.Supp. at 40 n. 4. In Count II, Missouri argued that the DCA's failure to timely process the Amendment estopped the agency from later disapproving it. Under both counts, Missouri asked the district court to declare that the Amendment was approved by operation of law.

### 1. Count I.

The Secretary defended Count I on two grounds. First, the Secretary argued that the action was premature because Missouri failed to exhaust its administrative remedies. Alternatively, the Secretary argued that the language of 45 C.F.R. § 95.511 does not support a "deemed approval" construction, and that such a construction would be contrary to the Secretary's interpretation of that regulation.

As to the first argument, the court held that exhaustion of administrative remedies was not required in this case:

> The federal agency has previously announced and has consistently maintained that it does not subscribe to plaintiffs' "deemed approval" theory; consequently, there is no need to await exhaustion of administrative remedies to ascertain the Secretary's position on this issue. The Court also notes that the issue raised by Count I is primarily a legal one; there is no need to await completion of administrative review to develop the record herein.

*Bowen*, 638 F.Supp. at 40–41.

The court thus ruled on the merits of Missouri's claim, holding that Count I

failed to state a cause of action. The court felt that three observations supported this result:

> First, § 95.511 does not expressly provide, nor does it implicitly suggest, that "deemed approval" is an appropriate sanction for the federal agency's failure to give the State written notification within 60 days. It bears emphasis that the 60–day deadline is not just a time limit for approval or disapproval of a proposed plan amendment. By its terms, § 95.511 only requires written notification of: (1) approval or disapproval; *or* (2) the need for modification of the proposed plan amendment; *or* (3) the need for additional information to evaluate the proposed plan amendment. Since the regulation leaves these options open to the DCA, the Court cannot say that the DCA's failure to respond in writing within 60 days constitutes "deemed approval" of the proposed plan amendment.[11]

Second the Court is reluctant to adopt plaintiffs' "deemed approval" construction of § 95.511 where the Secretary has never advanced nor approved such an interpretation. It is well-settled that the Secretary's interpretation of his regulations is entitled to substantial deference. *See, e.g., Medical Center of Independence v. Harris*, 628 F.2d 1113, 1117 (8th Cir.1980). Here, there are no circumstances present which militate in favor of deviating from this general rule. Accordingly, the Court will not create a common law remedy for noncompliance with § 95.511 where such a ruling would conflict with the Secretary's interpretation of his own regulations.

Third, and most important, the Court notes that the State was not totally without a remedy during and after the 60–

---

11. In a footnote, the court stated it was particularly reluctant to put such a gloss on § 95.511 in the instant case in view of two undisputed facts: (1) within the 60–day time limit, the federal agency had indicated orally that it needed more time to evaluate the proposed plan amendment; and (2) the federal agency did respond in writing and did request additional information from the State only 2[6] days after the 60–day period had expired. *Bowen*, 638 F.Supp. at 41 n. 6.

Missouri claims, however, that the first fact is *not* undisputed in that the DCA never specifically stated, within the 60–day period, that it needed more time to evaluate the Amendment. Missouri asserts that the court's comments may have stemmed from the December 12, 1984 letter written by the state, but that that letter never indicated that the communications took place within the relevant time period.

day period. 45 C.F.R. § 95.517 expressly allows a State to collect federal reimbursement under a proposed plan amendment from the date of submission. It is true that, under § 95.517, the State will only receive FFP to the extent the proposed plan amendment is ultimately approved. Nevertheless, under the regulatory scheme, it is apparent that § 95.517 is the vehicle by which a State may protect itself from federal agency delay. Indeed, plaintiffs used § 95.517 with respect to their proposed plan amendment: in a letter dated February 4, 1985—well after the proposed plan amendment would have been "deemed approved" under plaintiffs' theory—[Missouri] informed the federal agency that it was submitting its claim for FFP under the September 25, 1984 proposed plan amendment "as permitted under 45 C.F.R. § 95.517."

*Id.* at 41.

### 2. Count II.

The court characterized Count II as a "common law variation on Count I" in which Missouri sought the same result—approval of its Amendment—on equitable estoppel grounds. *Id.* at 42. Although the Secretary again raised the exhaustion argument, the court held that exhaustion was inapplicable for the same reasons as in Count I. *Id.* Proceeding to the merits, the court held that Count II failed to state a cause of action. The court noted that equitable estoppel does not apply to the federal government absent proof of some type of " 'affir-

12. In Count III of its complaint, Missouri asked for a preliminary injunction requiring the Secretary to process its claims for federal financial participation for the years 1980 through 1985. *See Bowen,* 638 F.Supp. at 42–43. This claim subsequently resulted in a settlement agreement, however, and is not on appeal to this court.

13. It was brought out at oral argument that the GAB no longer felt it had jurisdiction of the precise issue before this court—the effect of the DCA's noncompliance with 45 C.F.R. § 95.511. According to the Secretary, the GAB sent both parties a letter after the district court reached its decision. The letter apparently stated that the GAB felt it was "bound" by the decision, and thus "saw no need to rule on the 60–day issue." Therefore, the GAB presently has before it only

mative misconduct,' by the government." *Id.* (citations omitted). Even if an estoppel claim would lie against an ordinary defendant under the circumstances of the case, the court found no evidence of "affirmative misconduct" by the Secretary or the DCA; rather, the sole claim of wrongdoing was the DCA's failure to take prompt action on the Amendment. Accordingly, the court dismissed Count II. *Id.*[12] This appeal followed.

## II. DISCUSSION.

At the outset, we emphasize that Missouri is not challenging the DCA's substantive reasons for disapproval of the Amendment. Missouri appealed this determination to the DHHS Regional Director, and subsequently to the Grant Appeals Board, the latter of which has sole jurisdiction of this matter but has yet to rule on it.[13] Missouri's appeal to this court solely involves the question of the effect of the DCA's noncompliance with 45 C.F.R. § 95.511. As a result of this noncompliance, Missouri is asking this court for a limited deemed approval remedy: to require the Secretary to process its claims for federal financial participation from the date the Amendment was submitted—September 25, 1984—through the date the DCA finally disapproved the Amendment—May 29, 1985.[14] Before reaching Missouri's claim, however, we first address the Secretary's renewed contention that jurisdiction of the claim is improper because Missouri failed to exhaust its administrative remedies.

Missouri's substantive challenges to disapproval of its Amendment.

14. Upon our request, Missouri submitted a letter to this court outlining the exact relief it is seeking. Because there was some discussion at oral argument as to whether the Amendment would be deemed approved, if at all, as of the date of submission or on the sixty-first day thereafter, the state provided amounts for both time periods:

| Effective Date of Amendment | Disputed Reimbursement |
| --- | --- |
| Sept. 25, 1984 - May 28, 1985 | $2,755,770 |
| Nov. 25, 1984 - May 28, 1985 | $2,119,788 |

Although disapproval of the Amendment came by letter dated May 29, 1985, Missouri computed the amounts through May 28 because this was the final date the Amendment was effective.

### A. Exhaustion of Administrative Remedies.

The Secretary asserts that the district court erred in accepting jurisdiction of Missouri's claim because Missouri failed to exhaust its available administrative remedy before the Grant Appeals Board under 45 C.F.R. Part 16. The Secretary argues that the issue presented to the court—the effect of noncompliance with 45 C.F.R. § 95.511—had just been filed for review before the Board, and thus, the district court intervened in the ongoing administrative appeals process. Thus, the Secretary urges this court to rule in accordance with *Granville House, Inc. v. Department of Health and Human Services*, 715 F.2d 1292 (8th Cir.1983), and to hold that because the Board has not been given the opportunity to render a "final decision" on the matter, the district court erred in proceeding to the merits.

■ Initially, we note that the precise jurisdictional question raised in *Granville* was not whether the plaintiffs had exhausted their administrative remedies, but whether the issue presented to the court was sufficiently formulated as to be "ripe" for review. *See Granville*, 715 F.2d at 1299. These two doctrines should not be confused. Although they are related, in that courts employ both concepts in determining whether to inject themselves into the administrative process, the exhaustion doctrine focuses on procedure while the ripeness doctrine focuses on substance. *See* 5 B. Mezines, J. Stein & J. Graff, Administrative Law § 48.01, at 48–3 to –4 (1985) (citations omitted).

The case at bar does not present the ripeness concerns which this court addressed in *Granville*.[15] However, whether Missouri failed to exhaust its administra-

---

**15.** In determining whether an issue is ripe for review, courts are obliged to adhere to the two-part test set forth by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 115, 18 L.Ed.2d 681 (1967): whether the issue is fit for judicial decision, and second, whether withholding court consideration would result in hardship to the parties. The first prong breaks down into whether the issue presented is a legal one, and whether the agency action in question is final within the meaning of section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. *See id.* at 149, 87 S.Ct. at 1515. The Court further indicated that the element of finality should be interpreted in a "pragmatic way" and with a "flexible" approach. *Id.* at 149, 150, 87 S.Ct. at 1515, 1516.

After discussing the *Abbott* test and the applicable facts, this court held in *Granville* that the issue presented to it was not ripe for review. *Granville*, 715 F.2d at 1299–1304. In *Granville*, the precise issue was whether "chemical dependency is properly classified as a mental disease under the Medicaid statute." *Id.* at 1296 n. 5. There, the DHHS adopted the World Health Organization's International Classification of Disease ("ICD") guidelines, which listed chemical dependency as a mental disease. *See id.* at 1295. This court noted, however, that there was no indication of what Congress meant by the term, *id.* at 1299–1300, no indication that DHHS carefully considered the ICD classification in the context of the Medicaid scheme, *id.* at 1300, and, "[m]oreover," the GAB had never entered a "final" decision on the issue. *Id.*

We interpret the court's holding to mean that both parts of the first prong of the *Abbott* test were not satisfied: the issue presented was fac-

tual, not legal, *see id.* at 1300; and there had been no "final" decision by the GAB, much less *any* official decision by the federal agency. Clearly, then, the issue was simply not fit for judicial decision.

In contrast, the issue presented by Missouri to this court is more legal than factual; we are concerned with the effect of the DCA's noncompliance with a regulation, which is akin to the purely legal issue of statutory interpretation. Additionally, although the GAB admittedly has not rendered its decision on this matter, the DHHS Regional Director did rule on this issue in line with the Secretary's interpretation of the regulation. Keeping in mind the flexible and pragmatic approach to the concept of finality, it appears that the Regional Director's decision was "promulgated in a formal manner," "definitive," and a decision with which the DHHS expected "compliance." *See Abbott*, 387 U.S. at 151, 87 S.Ct. at 1517.

Moreover, that the GAB's decision on this issue was not essential draws support from section 10(c) of the APA, which states:

Except as otherwise *expressly required by statute, agency action otherwise final is final for purposes of this section * * * for any form of* reconsideration, or *unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to a superior agency authority.*

5 U.S.C. § 704 (emphasis added). The statutory and regulatory scheme at issue here does not expressly mandate that an appeal be taken to the GAB before obtaining judicial review. *See* 45 C.F.R. Parts 16, 75. Thus, it appears that section 10(c) of the APA, in conjunction with the Supreme Court's "flexible" approach to finality, indicate that an intra-agency appeal in this case

tive remedies is an issue this court must address.

Under the exhaustion doctrine, a party generally is required to pursue all available administrative remedies before obtaining judicial review on the merits of a claim. *E.g., McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The doctrine, however, is "subject to numerous exceptions," and its application "to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." *Id.; see West v. Bergland,* 611 F.2d 710, 715 (8th Cir.1979) (doctrine is not to be applied "woodenly"), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).

The basic concept underlying the requirements of the exhaustion doctrine is that of judicial economy. Encouraging exhaustion serves to avoid premature interruption of the administrative process by allowing an agency to apply its special expertise, to discover and correct errors, and to develop a factual background on the issue in question. *See McKart,* 395 U.S. at 193–95, 89 S.Ct. at 1662–63; *West,* 611 F.2d at 715–17. Moreover, requiring exhaustion discourages the "frequent and deliberate flouting of the administrative processes." *McKart,* 395 U.S. at 195, 89 S.Ct. at 1663; *West,* 611 F.2d at 715.

■ In this case, although the regulatory framework provides for an appeals process, the governing statutes and regulations do not *require* a party to exhaust its administrative remedies prior to obtaining judicial review. *See* 45 C.F.R. Parts 16, 75. Thus, application of the doctrine rested within the sound discretion of the district court. *See, e.g., Rodrigues v. Donovan,* 769 F.2d 1344, 1348 (9th Cir.1985); *Qasem*

was not required. *Cf. United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 440 (9th Cir.1971) (in context of exhaustion doctrine, "[i]ntra-agency appeals are not a prerequisite to judicial review except to the extent statutes or appropriate agency rules command otherwise"); *see also Montgomery v. Rumsfeld,* 572 F.2d 250, 253 n. 3 (9th Cir.1978) (limiting *Consolidated Mines* statement to statutorily imposed exhaustion requirements).

*v. Kozarek,* 716 F.2d 1172, 1175 (7th Cir. 1983). We believe that the court did not abuse its discretion in finding that exhaustion was not required in this case.

First, as the district court noted, the issue before it—the effect of noncompliance with 45 C.F.R. § 95.511—was primarily a "legal one." *Compare Granville,* 715 F.2d 1292 (issue involved essentially a factual determination). Thus, development of a factual record was unnecessary to the court's decision. Moreover, the issue requires no special agency expertise, but rather, involves interpretation of a regulation which is a matter better suited for the courts. *See, e.g., McKart,* 395 U.S. at 197–98, 89 S.Ct. at 1664–65 (matters of statutory interpretation do not require any special expertise of the agency); *accord Atlantic Richfield Co. v. United States Department of Energy,* 769 F.2d 771, 782 (D.C.Cir.1984); *Aleknagik Natives Limited v. Andrus,* 648 F.2d 496, 501 (9th Cir. 1980).

Second, the appeal here is not of such a nature that will encourage flouting of the administrative processes. Missouri is not asking this court to review the *merits* of the Amendment's disapproval, which is the typical case where this interest is implicated. *See Rodrigues,* 769 F.2d at 1348–49. Rather, this appeal involves a situation as in *West,* where we stated:

> [The plaintiff's claim] requires no application of special agency competence and, while not manifestly compelling on its merits, is not frivolous, either. It presents a question of first impression and is not easily rejected. We doubt, then, that early review of questions of this sort will induce litigious interruption of the agency's enforcement program.

Finally, we note that accepting review of this issue did not preclude the GAB from ruling on the substantive challenges to the Amendment, although it has yet to to do. Resolution of the issue before this court, therefore, should not impede the enforcement and administration powers of the agency. *See Alabama Power Co. v. FERC,* 685 F.2d 1311, 1315 (11th Cir.1982), *cert. denied,* 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983).

Courts are well equipped to deal with such tactics should they arise.

*West,* 611 F.2d at 716.

Moreover, it is probable that requiring exhaustion in this case would contravene the very notion of judicial economy that the doctrine is intended to serve. The Secretary has taken the position that Missouri's "deemed approval" remedy contradicts his own interpretation of the regulation. It seems highly unlikely that a higher appeals board of the DHHS would rule to the contrary. Presumably, another adverse decision would bring Missouri to this court once again to address the same issue. *Cf. Sioux Valley Hospital v. Bowen,* 792 F.2d 715, 724 (8th Cir.1986) (exhaustion not required where administrative appeal would be futile and little more than a formality).

In summary, we conclude that the district court did not abuse its discretion in determining that Missouri did not have to appeal the 60-day issue to the Grant Appeals Board. Therefore, we now proceed to the merits of Missouri's claim.

## B. The Merits.

Missouri argues that the district court erred in failing to recognize the egregious nature of the DCA's violation of 45 C.F.R. § 95.511, noting that a final decision had not been rendered until May 29, 1985. Missouri claims that despite the fact that the statutory and regulatory framework do not provide a remedy for noncompliance, a limited deemed approval remedy would be an appropriate sanction, based on Medicaid precedent. Missouri asserts that the remedy is deserved in this case because of the hardship resulting from the loss of the funds. Although we sympathize with Missouri's position, we cannot agree.

■ As the district court found, there is no legal theory supporting Missouri's "deemed approval" remedy. First, as the court explained, neither the statute nor the regulation provides for this remedy. *See Bowen,* 638 F.Supp. at 41. Moreover, although section 95.511(a) requires written notification under three situations, the last sentence reads: "If the DCA cannot make a determination within the 60-day period, it shall so advise the State." 45 C.F.R. § 95.511(a). Literally read, the regulation does not require written notification that additional time is needed for consideration of the plan. Given the communications between the parties, at the very least the DCA complied with this part of the regulation.[16] Additionally, it cannot be questioned that the DCA complied with the regulation only 26 days after the 60-day period had expired. Thus, a "deemed approval" remedy effective from September through May would require us to find that the DCA did not comply with the regulation when it sent its December 20 letter.[17] Clearly, this would be erroneous.[18]

16. We note that one purpose of the 60-day deadline may be to ensure that a state is kept apprised of the status of its proposed plan. Under the facts of this case, it would be difficult for Missouri to argue that it was unaware of the status of its plan, given the communications between the parties.

17. Missouri asserts that although the December 20 letter from the DCA requested additional information, the January 23 letter "effectually rescinded and nullified" the earlier letter. Apparently, Missouri therefore claims either that: (1) the earlier request was invalid, and that the DCA did not comply with section 95.511 until May 29, 1985; or (2) the DCA's December 20 letter should be deemed invalid. Neither of these claims have merit, however, in light of two facts. First, the only thing the January 23 letter expressly did was to not require Missouri to supply the information by the date it had originally set; and second, the suspension of the

due date as indicated in the letter came about only because of a meeting between the parties.

18. The district court based its decision on two other factors. *See Bowen,* 638 F.Supp. at 41. These grounds, however, are not the basis for this court's decision. Although we agree that the Secretary's interpretation of his own regulations is entitled to substantial deference, we are wary of holding that *inaction* amounts to an interpretation that should be afforded such heavy weight; the Secretary has never officially promulgated an interpretation of the regulation and this interpretation apparently arises only as a result of this case.

Additionally, we agree with the court's "most important" consideration—that 45 C.F.R. § 95.-517 provides a remedy to states when the DCA's decision is delayed. However, as Missouri points out, this remedy does not apply in cases such as this, where the Secretary is late *and* also disapproves the plan.

Additionally, even assuming the DCA did violate the regulation, our decision in *State of Minnesota v. Heckler*, 779 F.2d 1335 (8th Cir.1985) does not support a limited approval remedy in this case. In *Heckler*, the State of Minnesota argued that the Secretary's failure to act on proposed Medicaid amendments within the prescribed 90 days precluded the Secretary from disapproving the amendments. The statutory framework at issue in *Heckler*, however, is significantly different from the one at issue in this case.[19] Moreover, the Secretary did not issue a written disapproval of that plan until about nine months after the deadline expired. In contrast, the DCA in this case orally notified Missouri within the 60–day period that it needed more time to evaluate the Amendment, and its written notice requiring more information came only 26 days after the deadline expired. Thus, contrary to the facts in *Heckler*, not only was Missouri aware of the status of the Amendment, the DCA complied with the letter of the regulation, at the very least, only 26 days late.

Moreover, in denying Minnesota's claim, this court stated:

> The ninety day limitation for approving a state plan amendment is a procedural rather than a substantive rule. Failure to follow this procedural rule will not invalidate agency action in the absence of prejudice to the complaining party. *Dodson v. National Transportation Safety Board*, 644 F.2d 647, 652 (7th Cir.1981) (per curiam); *EEOC v. Lacklede Gas Co.*, 530 F.2d 281, 284–85 (8th Cir.1976). "Before an agency action may be set aside for lack of punctuality, the aggrieved party must show that it was prejudiced by the delay." *Panhandle*

*Cooperative Association v. EPA*, 771 F.2d 1149, 1153 (8th Cir.1985).

*Heckler*, 779 F.2d at 1337.

Like the regulation in *Heckler*, the regulation here is a procedural rather than a substantive rule. Thus, Missouri would have to show prejudice before the Secretary's action could be set aside. We recognize that the DCA's delay may have caused Missouri a number of problems in implementing its foster care and adoption assistance program. However, in contrast to the approximately nine-month delay in *Heckler*, the DCA's delay here was only 26 days. Further, Missouri's new amendment was approved on September 23, 1985, and provided for an effective date of July 1, 1984. Although this amendment provided less federal funding to Missouri than it had originally sought, the State will receive federal funding for the intermittent period.[20]

### III.  CONCLUSION.

This court concludes that, under the facts of this case, there is no legal basis supporting a limited deemed approval remedy, in light of the dictates of Title IV–E and the applicable regulations. Accordingly, the district court's order dismissing Missouri's claims is affirmed.

---

**19.** In *Heckler*, the court dealt with 42 U.S.C. § 1316(a)(1) and 45 C.F.R. § 201.3(f). Section 1316(a)(1) provides that the Secretary "shall, not later than 90 days after the date the plan is submitted to him, make a determination as to whether it conforms to the requirements for approval," and that this 90–day period may be extended only "by written agreement of the Secretary and the affected State." 42 U.S.C. § 1316(a)(1).

Thus, this statute and its accompanying regulation are markedly different from 45 C.F.R. § 95.511, which gives the DCA various options with respect to a proposed CAP or CAP amendment.

**20.** We also agree with the district court's analysis of Count II of Missouri's complaint, *see Bowen*, 638 F.Supp. at 42, and affirm that part of the court's decision on the basis of its well-reasoned opinion.