934 F.2d 959
 Orvin FROHOLM, and Evelyn Froholm, Carl O. Froholm, A.
Caroline Cook and Patrick Cook, Gladys S. Driscoll
and Dennis J. Driscoll, and Doris P.
Bickel and Carl G. Bickel, Appellants,
v.
Edwin L. COX and Berry R. Cox, Appellees.
Orvin FROHOLM, and Evelyn Froholm, Carl O. Froholm, A.
Caroline Cook and Patrick Cook, Gladys S. Driscoll and
Dennis J. Driscoll, and Doris P. Bickel and Carl G. Bickel,
Sidney Benn, Doris McNamara, Gordon Ersted, Robert Ersted,
Catherine Olson, Alice Chase, First American Bank & Trust of
Minot as Trustee of Paul Siquardson Trust, Janet Lee
Schreiner, James Westdal, Marilyn Jean Yantorno, Thelma
Davis and Ruth Ersted, Appellants,
v.
Edwin L. COX and Berry R. Cox, and Apache Corporation, Appellees.
 Nos. 90-5100, 90-5101.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 16, 1990.
Decided May 31, 1991.
 
 1
 Maureen Holman, Fargo, N.D., for appellants.
 
 
 2
 John Morrison, Bismarck, N.D., for appellees.
 
 
 3
 Before LAY, Chief Judge, FAGG, Circuit Judge, and WRIGHT,* District Judge.
 
 
 4
 SUSAN WEBBER WRIGHT, District Judge.
 
 
 5
 This is an appeal by the appellants from unfavorable judgments in suits arising out of oil leases the appellants entered into with appellees. The appellants filed two actions in state court which were removed to federal court. The district court[1] granted appellees' motion for summary judgment on appellants' allegations of fraud and lack of good faith and, after a trial, dismissed the remaining claims, finding appellants had failed to exhaust their administrative remedies. The actions were consolidated on appeal. For reasons to be stated, we affirm the district court's rulings.
 
 I. FACTS
 
 6
 Each of the appellants owns certain mineral interests in McKenzie County, North Dakota. In November 1984, the Froholms entered into numerous oil and gas leases with Spectrum Resources, Inc. [Spectrum] which were ultimately assigned to appellees. Appellees subsequently acquired by assignment leases from the remaining appellants. On April 19, 1985, appellees applied to the Bureau of Land Management [BLM] for the creation of a federal exploratory unit known as the Antelope East Unit, which is the focus of one of the actions. Appellees proposed to include within the unit land leased from the federal government and land leased from appellants. The unit was approved by the BLM on June 25, 1985. On August 11, 1985, the Hagen # 1-13 well was spudded, which was the producing well for the Antelope East Unit. The well was completed on December 28, 1985. On January 27, 1986, appellees made application to the BLM for the formation of the Bakken Unit, the focus of the other action. The unit was approved two days later and on January 31, 1986, a well was spudded. This well, which was known as the Froholm # 1-18, was completed on March 29, 1986.
 
 
 7
 Appellants instituted these actions, seeking a determination that the unitization clause within the leases signed by the Froholms had been obtained by fraud, that the units were not formed in good faith or with geological justification, and that the appellees failed to give them notice of the proceedings before the BLM.
 
 
 8
 On a motion for summary judgment, the district court dismissed appellants' first cause of action, finding the Froholms were not induced by fraud when they signed lease agreements containing unitization clauses. It also dismissed their second cause of action in which appellants argued that appellees created the units in bad faith and against their wishes and intentions. The district court found that the fact that the creation of the units was contrary to the wishes of the appellants was irrelevant because the leases were valid and the unitization clauses binding on all appellants. It also found that the good faith of the lessee was irrelevant and the only issue to be considered is whether the geological data justifies the unit. After a trial, the district court declined to consider the remaining issues, finding that the appellants had failed to exhaust their administrative remedies.
 
 II. FRAUD
 
 9
 Summary judgment is a question of law to be reviewed de novo. Spalding v. Agri-Risk Services, 855 F.2d 586, 588 (8th Cir.1988). A party is entitled to summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view all inferences to be drawn from the facts in a light most favorable to the party opposing the motion. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 10
 In their first point, appellants argue the trial court improperly granted summary judgment to appellees on the issue of fraud. They assert a material issue of fact exists on the question of whether the Froholms were induced to enter into a contract which was designed to defeat their purpose of entering into leases which required production on each parcel in order to hold the lease beyond the primary term. The Froholms contend they insisted on having separate leases for different tracts of land in order to avoid having all their land under one lease with only one producing well. They in fact received separate leases, but those leases contained pooling or unitization clauses that allowed the appellees to do what the Froholms assert they were trying to avoid.[2]
 
 
 11
 To support their claim of fraud, appellants rely upon N.D. Cent.Code Sec. 9-03-08(3) which provides:
 
 
 12
 Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:
 
 
 13
 3. The suppression of that which is true by one having knowledge or belief of the fact;
 
 
 14
 Appellants contend that appellees, through the Spectrum representative, had knowledge that the Froholms did not want one well to hold their land; that the representative did not discuss pooling or unitization with the Froholms; and that the Froholms stated they wanted production on each tract of land leased to appellees and the appellees were aware of this requirement.
 
 
 15
 We conclude that the district court's summary judgment determination was correct. We are satisfied that the facts of the case, when viewed in a light most favorable to the appellants, fail to support their claim of fraud.
 
 
 16
 Appellants presented no evidence that appellees suppressed or withheld any information from the Froholms. The Froholms had the opportunity to and did read the leases and were given ample time to learn the terms of the leases before they executed them. The appellees did not engage in any misconduct in getting the Froholms to sign the leases and, as was noted by the district court, the Froholms were familiar with oil and gas leases and were successful in obtaining separate leases for each quarter section of land.
 
 
 17
 In David v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 440 N.W.2d 269 (N.D.1989), the appellant alleged he was fraudulently induced to enter into an arbitration agreement with appellee. The North Dakota Supreme Court affirmed the trial court's grant of summary judgment, holding that the appellee had no duty to draw the customer's attention to the arbitration clause in the contract. Appellants argue their case is distinguishable from David because the Froholms specifically required that the leases be written in such a way that there be production on each 160 acre tract in order for the lease to be continued beyond the end of the primary term. The court cannot ignore the state holding repeated in David that one who signs a contract ignorant of its contents cannot thereafter be heard to say that he did not read it, or that he supposed that it was different in terms. The "[f]ailure to read a document before signing does not excuse ignorance of its contents unless the party shows that he was prevented from reading it by fraud, artifice, or design by the other party or his authorized representative." Pioneer Credit Co. v. Medalen, 326 N.W.2d 717, 719 (N.D.1982). There is no contention that appellees prevented the Froholms from reading the oil and gas leases prior to signing them. Based upon the Froholms' failure to make a sufficient showing of fraud, the district court was correct in dismissing their claim as a matter of law.
 
 III. GOOD FAITH
 
 18
 Appellants also contend the district court erred in granting the appellees summary judgment on the issue of lack of good faith on the part of appellees in creating the units. The leases permitted appellees to unitize the leasehold estate with other land or leases in the immediate vicinity when in their judgment it was necessary or advisable to do so.[3] Appellants contend that a two-part test should have been employed to determine whether their lands were properly committed to units. They argue that, according to a recent tenth circuit case, Celsius Energy Co. v. Mid America Petroleum, Inc., 894 F.2d 1238 (10th Cir.1990), as well as two earlier cases from the same circuit, Boone v. Kerr-McGee Oil Industries, Inc., 217 F.2d 63 (10th Cir.1954) and Phillips Petroleum Co. v. Peterson, 218 F.2d 926 (10th Cir.1954), the court must consider whether the lessors acted in good faith in executing and filing the pooling designation and whether there was geological basis for the unit. Appellants argue that the issue of whether a lessee has exercised good faith toward a lessor mineral owner when creating a unit is a question of fact and they should have been allowed to present evidence to show appellees did not act in good faith when they proposed the Antelope East and Bakken Units. Appellants criticize the district court's adoption of what they term a "restrictive" interpretation of the concept of good faith and its reliance on a prior North Dakota district court case, Sotrana-Texas Corp. v. Mogen, 551 F.Supp. 433 (D.N.D.1982), in holding that appellees need only prove geological justification for the establishment of the federal units.
 
 
 19
 There is no question that an oil and gas lessee must exercise the pooling and unitization power granted by an oil and gas lease in "good faith" as opposed to "bad faith." Bruce M. Kramer and Patrick H. Martin, 1 The Law of Pooling and Unitization Sec. 8.06 at 8-33 (Matthew Bender, 3rd ed.1989). Appellees contend, however, that geological justification is tantamount to good faith as production of oil and gas is clearly in the best interests of the lessee and lessor. A federal unit may only be established for the purposes of conserving natural resources of any oil and gas pooled where the Secretary of the Interior determines that it is necessary or advisable in the public interest. 30 U.S.C. Sec. 226(m) (Supp.1990). While the unit agreements may be contrary to the appellants' personal wishes, unitization is for the purpose of more properly developing oil and gas. Thus, if appellees are able to establish geological justification then it follows that they are taking into account the appellants' interests and acting in "good faith."
 
 
 20
 In Sotrana-Texas Corp., supra, the court directed its consideration to whether the geological data justifies the unit and did not attempt to determine the lessee's subjective intent. It took this approach for a number of reasons. First, it said that it is almost impossible to show subjective intent where the lessee would almost always be motivated by economic interest, coupled with the knowledge that unitization normally results in the most efficient oil recovery. Second, the court stated that a lessor would not be any worse off even if the lessee formed the unit for some purpose other than maximizing oil recovery if the unit in fact increased oil recovery. "The principle object of concern to the lessor is the geological justification, not the intention of the lessee." Id. at 437. Third, unitization, which allows for the conservation of oil resources and encourages development of resources which otherwise might not occur, is in the public's interest. Unitization is encouraged by restricting consideration to the geological question rather than allowing consideration of the lessor's economic interests. Fourth, a stricter test would go well beyond the contractual provisions of the standard unitization clause which, like the one here, allow unitization when the lessee judges it "necessary and advisable" to do so.
 
 
 21
 Production of oil and gas is clearly in the best interest of the lessee and lessor. Unit agreements, such as the Antelope and Bakken agreements, are to provide for the prudent and proper development of oil and gas. A federal unit may only be established for the purpose of conserving the natural resources of any oil and gas pooled where the Secretary of the Interior determines that it is necessary or advisable in the public interest. 30 U.S.C. Sec. 226(j).
 
 
 22
 Although the unit agreements may be contrary to the Froholms' personal wishes, unitization is for the purpose of more properly developing oil and gas; therefore, the units would naturally operate to the benefit of both the lessee and lessor. We cannot say the district court erred in applying Sotrana-Texas Corp. v. Mogen, supra, and finding that it was unnecessary to consider the good faith of the appellees.
 
 IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES
 
 23
 For their final point on appeal, appellants assert that the leases terminated at the end of the primary term because appellees failed to give them notice of proceedings before the BLM which effected the establishment and continuation of the Antelope East and Bakken units.
 
 
 24
 The district court found that appellants were given no notice of the application for the creation of the unit and no notice of the filings that led to the establishment of the participating units. The court declined to consider the issue of whether appellees were required to give notice, however, finding that the administrative decision was not a final decision because appellants had administrative review and appellate procedures available to them. The court further stated that the issue was not ripe for judicial review. On appeal, appellants argue that the issue of failure to give notice was ripe for adjudication and that the district court improperly required them to exhaust administrative remedies.
 
 
 25
 Although the trial court framed its decision in terms of "ripeness," the court decided the matter on the basis of exhaustion of remedies, stating:
 
 
 26
 The purpose behind the exhaustion requirement is to prevent 'premature interference with agency processes, so that the agency may function efficiently and so it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.' See Weinberger v. Salfi, 422 U.S. 749, 765 [95 S.Ct. 2457, 2467, 45 L.Ed.2d 522] (1975).
 
 
 27
 Memorandum and Order, filed January 29, 1990, at p. 12.
 
 
 28
 Appellants contend this is not a proper case in which to invoke the doctrine of exhaustion of remedies because the time for them to appeal has long past and there is no method in the unit agreement for challenging administratively the initial establishment of the unit and the determination that a productive well was drilled. In finding that appellants had administrative procedures available to them, the district court referred to sections of the Code of Federal Regulations which address the procedure for obtaining BLM approval of a unit agreement. See 43 C.F.R. Secs. 3180.0-1--3183.7. In addition, paragraph eleven of the unit agreement expressly provides for the revision of participating units:
 
 
 29
 The participating areas or areas so established shall be revised from time to time, subject to the approval of the AO [Authorized Officer], to include additional lands then regarded as reasonably approved to be productive of the unitized substances in paying quantities or which are necessary for unit operations, or to exclude lands then regarded as reasonably approved to be productive of unitized substances in paying quantities, and the schedule of allocation percentage shall be revised accordingly. The effective date of any revisions shall be the first of the month in which the knowledge or information is obtained on which such revision is predicated; provided, however, that a more appropriate effective date may be used if justified by Unit Operator and approved by the AO. No lands shall be excluded from the participating area on account of the depletion of its unitized substances, except that any participating area established under the provisions of this unit agreement shall terminate automatically whenever all completions in the formation in which the participating area is based are abandoned.
 
 
 30
 Not only does the BLM have jurisdiction to revise participating areas, but it also has continuing jurisdiction to determine if a well which was initially classified as a unit well should be reclassified as a lease well. Again, paragraph eleven of the unit agreement provides in part:
 
 
 31
 Whenever it is determined, subject to the approval of the AO, that a well drilled under this agreement is not capable of production of unitized substances in paying quantities and inclusion in a participating area of the land in which it is situated in a participating area is unwarranted, production from such well shall, for the purposes of settlement among all parties other than working interest owners, be allocated to the land on which the well is located, ...
 
 
 32
 Although appellants contend that the doctrine of exhaustion of administrative remedies is not applicable in the instant case because the time for appeal through the BLM has long passed, the Court does not agree. In Chevron U.S.A., Inc., 111 I.B.L.A. 96 (1989), the Interior Board of Land Appeals held that where notice of approval of a unit expansion was not given to an interested party, such failure resulted in the ability to appeal or challenge a later determination. Thus, not only do appellants have available administrative remedies, but the BLM is clearly the more appropriate forum to address their claims.
 
 
 33
 The basic concept underlying the requirement of the exhaustion doctrine is that of judicial economy. Encouraging exhaustion serves to avoid premature interruption of the administrative process by allowing an agency to apply its special expertise, to discover and correct errors, and to develop a factual background on the issue in question.
 
 
 34
 Missouri v. Bowen, 813 F.2d 864, 871 (8th Cir.1987). Regarding federal exploratory units, Congress has specifically delegated the authority to approve, alter, or modify unit plans to the Secretary of the Interior. See 30 U.S.C. Sec. 226(m) (Supp.1989). Pursuant to this statute, regulations have been promulgated directing the BLM to manage all aspects of said unit agreements. See 43 C.F.R. Secs. 3180.0-1--3183.7. We believe the district court did not err in requiring appellants to pursue available administrative remedies.
 
 V. Conclusion
 
 35
 The briefs and oral arguments have not persuaded us that the district court erred. We find that the district court properly granted summary judgment on the issues of fraud and good faith and correctly held that appellants failed to exhaust their administrative remedies. Its judgment is accordingly AFFIRMED.
 
 
 
 *
 The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 The Honorable Patrick A. Conmy, United States District Court Chief Judge for the District of North Dakota
 
 
 [2]
 As the district court pointed out in its memorandum and order, a drilling unit or pool is a designated area, larger in size than the well spacing requirements in force, where the drilling of one well will "hold" the leases of all acreage involved, subject to the terms of a "unit agreement" filed with the BLM and approved by its "authorized officer." The rationale for units is that in some situation and geologic formations, it is more economical and better designed to recover more of the oil reserve if fewer wells are drilled than would otherwise be permitted
 
 
 [3]
 The unitization clause in the leases in dispute reads, in pertinent part:
 Lessee, at its option, is hereby given the right and power at any time and from time to time as recurring right, either before or after production, as to all or any part of the land described here and as to any one or more of the formation hereunder, to pool or unitize the leasehold estate and the mineral estate covered by this lease with other land, lease or leases in the immediate vicinity for the production of oil and gas, or separately for the production of either, when in Lessee's judgment it is necessary or advisable to do so ...